IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| KAREN BUSKIRK, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>KINDRED HEALTHCARE, INC., PHYLLIS R. YALE, BENJAMIN A. BREIER, PAUL J. DIAZ, SHARAD MANSUKANI, JOEL ACKERMAN, JONATHAN D. BLUM, HEYWARD R. DONIGAN, RICHARD GOODMAN, CHRISTOPHER T. HJELM, FRED J. KLEISNER, and LYNN SIMON,<br><br>Defendants. | Civil Action No. 3:18-CV-92-JHM<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Karen Buskirk ("Plaintiff"), by and through her attorneys, alleges the following on information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge.

**NATURE OF THE ACTION**

1.     This action stems from a proposed transaction announced on December 19, 2017 (the "Proposed Transaction" or "Merger"), pursuant to which Kindred Healthcare, Inc. ("Kindred" or the "Company") will be acquired by a consortium of three companies:  TPG Capital ("TPG"), Welsh, Carson, Anderson & Stowe ("WCAS") and Humana Inc. ("Humana") (collectively, the "Consortium") for $9.00 per share, or approximately $4.1 billion in cash.

2.     On December 19, 2017, Kindred's Board of Directors (the "Board" or the "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with the Consortium.  Pursuant to the terms of the Merger

Agreement, the Consortium will purchase each issued and outstanding share of Kindred common stock for $9.00 in cash (the "Merger Consideration").

3.      Immediately following the consummation of the Merger, a portion of Kindred's business that offers home health, hospice and community care services, will become a standalone entity owned 40% by Humana and 60% by TPG and WCAS ("Kindred at Home").  The remainder of Kindred's business, which operates long-term acute care hospitals, inpatient rehabilitation facilities, and a contract rehabilitation services business, will become a separate specialty hospital company owned by TPG and WCAS ("Kindred Healthcare").  Defendant Breier (defined below) will serve as CEO of Kindred Healthcare.  David Causby, the current Executive Vice President and President of Kindred at Home will serve as CEO of Kindred at Home.

4.      On February 5, 2018, Defendants filed a preliminary proxy statement on Schedule 14A (the "Proxy") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.  As described herein, the Proxy omits material information with respect to the Proposed Transaction, which renders it false and misleading, in violation of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 140.14a-9 ("Rule 14a-9") promulgated thereunder.

5.      Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' wrongdoing described herein.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act, 15 U.S.C § 78aa, and 28 U.S.C. § 1331, as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

7.     This Court has personal jurisdiction over all of the Defendants because each is either a corporation that conducts business in, and maintains operations within, this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8.     Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

9.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Kindred common stock.

10.     Defendant Kindred is a Delaware corporation, with its principal executive offices located in Louisville, Kentucky.  Kindred's common stock is listed on the New York Stock Exchange (the "NYSE") under the symbol "KND."

11.     Defendant Phyllis R. Yale ("Yale") is the Chair of the Board, and has served as a Board member since 2010.

12.     Defendant Benjamin A. Breier ("Breier") is Kindred's President and Chief Executive Officer ("CEO").  Breier has served as a Board member since 2015.

13.     Defendant Paul J. Diaz ("Diaz") has served as a Board member since 2002.  He previously served, at various times, as Kindred's President, CEO, Chief Operating Officer ("COO"), and Executive Vice Chairman.

14.     Defendant Sharad Mansukani ("Mansukani") has served as a Board member since 2015 and is a member of the Board's Executive Compensation Committee.  Mansukani has also been a Senior Advisor to TPG (a member of the Consortium) since January 2005.

15.     Defendant Joel Ackerman ("Ackerman") has served as a Board member since 2008.

16.     Defendant Jonathan D. Blum ("Blum") has served as a Board member since 2008.

17.     Defendant Heyward R. Donigan ("Donigan") has served as a Board member since 2014.

18.     Defendant Richard Goodman ("Goodman") has served as a Board member since 2014.

19.     Defendant Christopher T. Hjelm ("Hjelm") has served as a Board member since 2011.

20.     Defendant Frederick J. Kleisner ("Kleisner") has served as a Board member since 2009.

21.     Defendant Lynn Simon ("Simon") has served as a Board member since 2016.

22.     The defendants listed in ¶¶ 11-21 are collectively referred to herein as the "Individual Defendants."

23.     Non-Party TPG is a leading global alternative asset firm founded in 1992 and has more than $73 billion of assets under management and offices located around the world.

24.     Non-Party WCAS is an investment firm founded in 1979 and has total capital of over $22 billion. WCAS focuses its investment activity in two target industries:  technology and healthcare, where it seeks to partner with management teams and initiate strategic acquisitions.

25.     Non-Party Humana is a for-profit American health insurance company based in Louisville, Kentucky.

## SUBSTANTIVE ALLEGATIONS

**Background**

26.     Kindred is a health care services company that operates home health, hospice and community care businesses, long-term acute care hospitals, inpatient rehabilitation facilities, and a contract rehabilitation services business.  Kindred has nearly 2,500 locations in 45 states.

27.     On July 25, 2017, the U.S. Centers for Medicare & Medicaid Services ("CMS") issued a proposed rule (the "HHGM Proposal") to overhaul the Medicare payment system, with major restructuring changes that could result in a payment cut of $950 million to home health care agencies, including Kindred, in 2019.

28.     According to the Proxy, the HHGM Proposal would "change reimbursement rates for home health reimbursement payments by moving from a unit of payment based on 60-day episodes of care to 30-day episodes of care."  Proxy at 54.  The National Association for Home Care & Hospice estimated that the HHGM Proposal would result in a greater than 15% effective payment rate cut, which substantially exceeded the estimate offered by CMS.  *Id*.

29.     On this news, Kindred's stock price fell by nearly 15%, from $11.20 per share to $9.55 per share.  Kindred's stock price continued to decline thereafter, eventually reaching a 52-week low of $5.60 per share on September 20, 2017.  Kindred's competitors also experienced stock price declines.   However, as discussed below, CMS ultimately decided against implementing the HHGM Proposal.

5

30.    On August 3, 2017, Kindred issued a press release announcing its operating results for the second quarter ended June 30, 2017.   According to Defendant Breier, the Company was "pleased to report strong second quarter operating results in line with expectations," which included making "solid progress growing our Kindred at Home and Kindred Rehabilitation Services divisions," where "[s]trong top line growth and another sequential decline in labor costs drove increased profitability in both businesses."   As a result, "[t]he growth in these businesses, solid cash flow performance and our enterprise-wide cost realignment initiatives position Kindred for future success."

31.    During the second quarter, Kindred reached agreements to sell its skilled nursing facility business, which the Company believed would "significantly enhance shareholder value and increase our focus on higher margin, faster growing and less capital intensive businesses, all of which will increase the fundamental cash generating capacity of our enterprise."   Kindred also continued to optimize its long-term acute care ("LTAC") portfolio, by migrating non-strategic LTAC hospitals into inpatient rehabilitation facilities ("IRF").   These actions helped "set the stage for additional progress in the coming quarters."

32.    With respect to the Company's cash flow, Stephen D. Farber ("Farber"), the Executive Vice President and Chief Financial Officer ("CFO") of Kindred, added:

> Cash flow is a primary focus for Kindred. We are very pleased with our strong second quarter cash flow performance that was in line with our expectations, and enabled us to reduce funded debt by $48 million during the quarter. We finished the quarter with excellent liquidity, with $157 million drawn on our $900 million revolving credit facility. After the sale of the skilled nursing facility business, we anticipate Kindred will have approximately $800 million of NOLs. As we have previously discussed, these NOLs should offset approximately 90% of book tax estimates for many years, and significantly augment cash generation.

33.    On September 20, 2017, Kindred issued a press release announcing that it expected a one-time pretax earnings impact from Hurricanes Irma and Harvey of approximately

$20 million in aggregate for the third quarter of 2017.  The Company noted that, as of the date of

the announcement, "the Company's impacted operations have substantially returned to normal

and the Company does not expect any significant impact on its financial results in the fourth

quarter of 2017 or beyond."  Defendant Breier added that the Company "did not sustain any

significant physical damage to any of our facilities" due to the storms, and its operations "have

now largely returned to normal, and we do not expect any meaningful lingering effects going

forward."

34.    On November 6, 2017, Kindred issued a press release announcing its operating

results for the third quarter ended September 30, 2017.  According to Defendant Breier, the

Company was "pleased to report third quarter results ahead of expectations," which included

making "good progress during the quarter on each of our ongoing key initiatives, including our

plan to fully exit the skilled nursing facility business and our continuing efforts to mitigate the

impact of [LTAC] patient criteria."  This enabled Kindred to "deliver[] solid operating results."

35.    Specifically, the Company completed the sale of most of its skilled nursing

facilities and expected that the remaining facilities would be divested by the end of 2017.  "We

continue to believe that the sale of our skilled nursing facility business will significantly enhance

shareholder value, enable us to sharpen our focus on higher margin and faster growing

businesses, and further advance our efforts to transform Kindred."  With respect to LTAC

migration, Defendant Breier noted that, "[t]he success of our ongoing LTAC patient criteria

mitigation strategy resulted in our Hospital Division delivering operating results that were

largely in line with expectations."

36.    Other major positive news included CMS's decision not to finalize the HHGM

Proposal.  The Company "commend[ed] CMS for considering the unanimous voice of patient

advocates, the home health provider community, and bipartisan Congressional leaders and for continuing an open dialogue with stakeholders regarding system design." The Company also stated that it was looking forward to "ongoing engagement and collaboration with CMS and Congress to develop a reformed model that strikes the right balance in promoting high quality home healthcare in a fiscally responsible manner."

37.     The Company also announced that, as a result of "improving underwriting results" from its wholly owned captive insurance subsidiary, Cornerstone Insurance Company ("Cornerstone"), as well as the restructuring of the funding mechanism and certain other elements of its insurance program, the Company generated approximately $281 million. Kindred used this money to repay the entirety of its $156 million outstanding asset-based loan revolving credit facility ("ABL") balance and to increase its cash reserves. Kindred also expected to receive "additional cash savings from these activities over the duration of the fourth quarter . . . ." According to Defendant Breier, "[t]he successful restructuring of our insurance program allowed us to deliver in a significant and immediate way on our commitment to reduce our leverage. The $281 million in liberated funds represents more than half of our 2018 Outlook for EBITDA and nearly two years of projected core free cash flows."

38.     With respect to the Company's cash flow, CFO Farber added:

We expect the fourth quarter of 2017 to be our strongest core operating cash flow quarter of the year, and expect to end the year with excellent liquidity, leaving no outstanding borrowings under our $900 million ABL and a large unrestricted cash balance. In addition to the previously discussed successful efforts this year to restructure the Company's funding of its insurance programs, we expect 2018 Core free cash flows from continuing operations plus tax-related cash flows from utilizing Kindred's NOL carry forwards to approximate $175 million at the midpoint of an estimated range. We intend to apply this cash flow primarily to repay debt and expect our adjusted debt to EBITDAR leverage to approximate 5.5x by the end of 2018.

39.     In early November 2017, U.S. Congress introduced tax reform legislation under the Tax Cuts and Jobs Act (the "Tax Bill") which would, among other things, lower the federal corporate tax rate from 35% to 20%, limit the deduction for net interest expense, place a cap on the utilization of net operating losses ("NOLs") arising after December 31, 2017 at 80% of taxable income and eliminate the ability to carryback NOLs. *See* Proxy at 60. The Tax bill was signed into law on December 22, 2017.

40.     Between November 1, 2017 and December 15, 2017 (the last trading day prior to media reports regarding the Proposed Transaction), Kindred's stock price increased by approximately 47%, from $5.85 per share to $8.60 per share. According to the Proxy, on November 7, 2017, Kindred's closing share price was $8.40, which reflected a 40% increase to Kindred's closing share price on November 6, 2017. Proxy at 60. "Equity research analysts covering Kindred attributed meaningful equity value primarily to information regarding Kindred's insurance restructuring." *Id*.

41.     On December 19, 2017, the day of the announcement of the Proposed Transaction, a Deutsche Bank research report analyzing the Proposed Transaction and the Merger Consideration stated, in pertinent part:

> We have rated KND HOLD since we launched coverage on July 10, 2017, but have always believed that if the company could successfully navigate Medicare reimbursement challenges – which are likely to persist through much of 2018, in our view – that ***KND shares could be worth substantially more over time***. Where we scratch our head is in regard to the strong 3Q17 financial performance, the concurrent announcement of a significant financial benefit provided by the restructuring of the company's Cayman-based captive insurance subsidiary which management projected would generate $281 mln of cash, and more generally management's 2018 financial outlook. So in short – we can see it both ways – $9 per share seems fair in the context of the substantial Medicare reimbursement challenges the company must navigate over the next 12-18 months, while conversely ***$9 might also seem very low one year from now if management executes on its 2018 financial outlook***. By way of background, our sum of the

parts analysis included in our December 17 note implies ***KND could be worth $15 or more***.  (Emphasis added.)

42.     On December 27, 2017, Donald E. Morgan, III, the Managing Member and General Partner of Brigade Capital Management, LP ("Brigade"), sent a letter to Defendant Breier (cc'ing the Board) that was also filed as an exhibit to a Schedule 13D with the SEC (the "Brigade Letter").  Brigade is one of Kindred's largest shareholders, owning approximately 5.7% of the Company's shares of common stock outstanding.  Proxy at 144.  In its letter, Brigade stated that it was "shocked" to learn of the Proposed Transaction and vigorously opposed it. Brigade explained that it was a "terrible time" for the Board to sell the Company, and the $9.00 per share Merger Consideration is "disappointing," "grossly inadequate" and "severely undervalues" the Company.

43.     The Brigade Letter stated, in pertinent part:

> As large and long-term shareholders of Kindred . . . , ***we were shocked*** at Kindred's announcement on December 19, 2017 that it had entered into a merger agreement, pursuant to which the Company will be acquired . . . for the disappointing and grossly inadequate price of $9.00 per share.
>
> ***From the perspective of maximizing shareholder value, this is a terrible time to sell the Company.*** This acquisition appears timed to enable the buyers and members of management to (i) take advantage of the negative impact that certain recent (but temporary) events have had on the Company's stock price, and at the same time (ii) avoid paying full value for operational enhancements that are in process but not likely to be fully realized until next year. Over the past year, Kindred's earnings power has been negatively impacted by significant restructuring, disposition and transition activities which, per recent management commentary, will be largely complete in late 2017. . . . . ***These near-term set-backs should position Kindred for stronger operating performance and substantial stock price appreciation going forward***.
>
> Given these circumstances, we would have expected the Company's fiduciaries to stay the course in order to enable shareholders to reap the benefits of these improvements that they patiently awaited from their continued ownership in Kindred. ***Instead, management and the Board of Directors have chosen to pursue a transaction that severely undervalues the Company and ensures that the buyers – rather than existing shareholders – will reap the benefits of the***

*value enhancement the improved business will generate. For these reasons, Brigade Capital does not believe the proposed transaction is in the best interests of Kindred shareholders, and intends to vote against the transaction*.

*      *      *

[T]he following initiatives and other factors can reasonably be expected to increase both long-term growth and shareholder value:

- *Improved Regulatory Environment*. In July 2017, the Company's stock price fell by almost 15% because the Centers for Medicare & Medicaid Services ("CMS") unexpectedly proposed reimbursement methodology changes that could have negatively impacted Kindred's Home Health business segment. ***Four months later, however, CMS decided not to include these changes in the final rule, removing a major near-term potential threat***.

- *Kindred has divested its low multiple Skilled Nursing assets*. Kindred has been actively divesting its skilled nursing facilities throughout the course of 2017. . . . . ***Kindred is in position to remove a significant amount of overhead expense and benefit from the more favorable earnings trajectory and cash flow characteristics of the remaining businesses***. . . .

- *The Company has strengthened its balance sheet since 3Q17*. In October 2017, ***Kindred restructured its insurance program*** in a manner that released $281 million of cash that was trapped in its captive insurance subsidiary, which the Company then used to pay down its revolver while still adding ~$100 million in cash to its balance sheet. ***These changes alone should be worth around $3.00 per share of value to the Company's stock price***. . . .

*      *      *

In light of the foregoing, the $9.00 per share valuation underlying the proposed transaction is ***fundamentally inconsistent with management's own statements regarding the Company's positive outlook, performance initiatives and earnings power going forward***. In our view, the deal price is ***not reflective of Kindred's intrinsic value and will short-change existing shareholders***. Kindred is positioned for significant stock price appreciation. The Company has ample liquidity, no near-term debt maturities, and is expected to generate around $175 million of core free cash flow in 2018. There is ***no urgency to sell the Company***, and conducting a sale process utilizing Kindred's significantly distorted trailing twelve month performance seems ***particularly misguided***.

*We believe this position is widely held by investors* and would note the significant amount of trading activity in Kindred stock since the transaction was officially announced above the proposed $9 share offer price.

*The proposed merger does not come close to maximizing shareholder value, is not in the best interests of shareholders and should not be approved by Kindred's owners*. Brigade is disappointed that Kindred's management and board have chosen to move forward with such a poor transaction.  (Bold italics added; non-bold italics in original.)

## The Proxy's Material Misrepresentations and Omissions

44.     Although the Proxy provides Kindred's stockholders with an overview of the Proposed Transaction, it omits certain critical information, which renders portions thereof materially incomplete and/or misleading, in violation of the Exchange Act provisions discussed herein.  As a result, Kindred's stockholders lack material information necessary to allow them to make an informed decision when voting on the Merger.

45.     In particular, the Proxy contains materially incomplete and/or misleading information concerning, *inter alia*: (i) the valuation analyses performed by Kindred's financial advisors in support of their fairness opinions, including certain of the projections upon which the financial advisors relied; and (ii) and potential conflicts of interest that may have tainted the Merger negotiation and sales process.

### *Material Omissions Concerning the Financial Advisors' Valuation Analyses*

46.     A financial advisor's opinion of a proposed transaction is one of the most important process-based underpinnings of a board's recommendation of a transaction to its stockholders.  Thus, it is imperative for stockholders to be able to understand what factors might influence a financial advisor's analytical efforts.

47.     The Proxy provides that in rendering their fairness opinions, Kindred's financial advisors, Barclays Capital Inc. ("Barclays") and Guggenheim Securities, LLC ("Guggenheim")

(collectively, the "financial advisors"), conducted various analyses that relied upon Kindred's management's financial projections, which were also provided to the Board in connection with its evaluation of the Proposed Transaction. *See, e.g.*, Proxy at 95 ("Kindred's management prepared and provided to the Board and to Barclays and Guggenheim Securities certain prospective financial information. . . . . The [p]rojections were approved by the Board for each of Barclays' and Guggenheim Securities' use for purposes of their respective financial analyses.").

48.     In arriving at its opinion, Barclays "reviewed and analyzed financial and operating information with respect to the business, operations and prospects of Kindred furnished to Barclays by Kindred, including financial projections of Kindred prepared by Kindred's management for the years 2017 through 2022" (defined herein as the "Projections"). Proxy at 73. Barclays also "reviewed and analyzed net operating loss ('NOL') projections of Kindred prepared by Kindred's management for the years 2017 through 2022," which the Proxy defines as the "NOL Projections," and which definition will be used herein. *Id*. "At the instruction of Kindred," Barclays also performed an "illustrative sensitivity analysis relating to certain potential changes to federal corporate tax rates and limitations on the deductibility of interest expenses, as well as reductions in Medicare reimbursement rates." Proxy at 81-82. To perform such analysis, "[a]t the direction of Kindred," Barclays adjusted the Projections in various ways to create, what the Proxy defines as the "Kindred [T]ax [S]ensitivity [P]rojections," and which definition will be used herein. *Id*. at 82.

49.     The Proxy makes *no disclosure* of either the NOL Projections or the Kindred Tax Sensitivity Projections and, as detailed below, fails to disclose material information about the Projections. *See* Proxy at 95. The failure to disclose the NOL Projections renders Barclays'

*Discounted Cash Flow Analysis* (Proxy at 76), Barclays' *Selected Comparable Company Analysis* (Proxy at 78-80), and Barclays' *Illustrative Future Share Price Analysis* (Proxy at 81)—which explicitly rely upon such projections—materially misleading. The failure to disclose the Kindred Tax Sensitivity Projections renders Barclays' *Illustrative Discounted Cash Flow Sensitivity Analysis* (Proxy at 82) and Barclays' *Illustrative Future Share Price Analysis* (Proxy at 82)—which explicitly rely upon such projections—materially misleading.

50.     In arriving at its opinion, Guggenheim "reviewed certain non-public business and financial information regarding Kindred's business and prospects, all as prepared and provided to Guggenheim Securities by Kindred's senior management and including: (i) "certain financial projections for Kindred for the years ended December 31, 2017 through December 31, 2022" (the previously defined "Projections"); (ii) "certain illustrative adjustments to the Kindred projections made by Kindred's senior management to reflect the potential impact of expected U.S. federal tax reform as provided in the Tax Bill" (the "Tax Projections"); and (iii) "certain further illustrative adjustments to the Kindred projections as to the potential negative impact on Medicare reimbursement arising from the Tax Bill" (the "Medicare Projections").

51.     The Proxy makes *no disclosure* of either the Tax Projections or the Medicare Projections and, as detailed below, fails to disclose material information about the Projections. *See* Proxy at 95. The failure to disclose the Tax Projections and Medicare Projections renders Guggenheim's *Illustrative Discounted Cash Flow Analyses (Tax Bill Cases)* (Proxy at 93)—which explicitly rely upon such projections—materially misleading.

52.     Management's financial projections are considered by courts to be the most important information a stockholder can have when evaluating the proposed consideration in a merger and deciding whether to vote in favor of a merger. Projections are highly material

14

because they enable shareholders to understand the company's intrinsic value and the extent of the market's undervaluation of their company.  As described herein, the Proxy's disclosure and discussion of the projections relied upon by the financial advisors is materially incomplete.

53.     Moreover, given that the financial advisors relied upon the Projections in conducting their financial analyses and rendering their fairness opinions, failure to include the complete Projections in the Proxy (and many of the other types of projections that were completely omitted) constitutes a material omission and renders the financial analyses materially misleading.  Once a proxy discloses internal projections relied upon by the board, those projections must be complete and accurate.

54.     Even the Projections that the Proxy does disclose are materially incomplete because they fail to disclose certain financial metrics that the financial advisors used as a basis for their analyses, including Kindred's estimated unlevered free cash flows ("FCFs").  Proxy at 95.  The failure to disclose FCFs renders the Proxy's discussion of the following financial analyses—each of which explicitly relies upon Kindred's FCFs—materially misleading:  (i) Barclays' *Discounted Cash Flow Analysis* (Proxy at 76); (ii) Barclays' *Illustrative Discounted Cash Flow Sensitivity Analysis* (Proxy at 82); (iii) Guggenheim's *Discounted Cash Flow Analysis (Kindred Projections)* (Proxy at 90); and (iv) Guggenheim's *Illustrative Discounted Cash Flow Analyses (Tax Bill Cases)* (Proxy at 93).

55.     The Proxy also fails to disclose the projected values of the line items that might be used to calculate the FCFs utilized in the financial advisors' analyses.  For example, Guggenheim's financial analysis defines the term "Unlevered free cash flow" to mean "after-tax operating cash flow (after deduction of stock-based compensation), plus depreciation expense and less capital expenditures, increases in net working capital, and any other adjustments

(including cash release and costs from insurance restructuring, non-controlling interest expense, and ongoing rental payments associated with certain divested and/or closed long-term acute care hospitals). Proxy at 88-89. However, the Proxy does not disclose any of the annual projections for these line items. Proxy at 95 (only disclosing projected Revenue, EBITDAR, and EBITDA). Barclays provides no definition for its calculation of FCFs.

56.     The non-disclosed information discussed in ¶¶ 54-55, above, would be material to Kindred shareholders in deciding how to vote their shares, as the lack of disclosure of the individual line items and inputs used by the financial advisors in their financial analyses (and in management's projections) prevents shareholders from understanding the context of the figures or considering whether any of the inputs thereto or ranges derived therefrom are anomalous.

57.     In addition to the above-discussed omissions concerning the various projections and FCFs, the following financial analyses contained additional material omissions.

58.     With respect to Barclays' *Discounted Cash Flow Analysis*, the Proxy (at page 76) fails to disclose: (i) certain of the inputs and assumptions underlying Barclays' calculation of the discount rate range of 8.5%-9.5%, including the beta and risk free rate; (ii) the basis for the terminal value perpetuity growth rates range of 1.75% to 2.25% Barclays used its analysis; and (iii) the yearly NOL figures Barclays used in its analysis.

59.     With respect to Barclays' *Selected Comparable Company Analysis*, the Proxy (at pages 78-80) fails to disclose: (i) the individual multiples that "Barclays calculated and analyzed [for] each company[]" it selected as part of its analysis; (ii) the mean and median multiples for the group of companies selected; (iii) the present value of Kindred's NOLs used in the analysis; and (iv) the inputs used to calculate the discount rate of 9.0% that Barclays applied.

60.     With respect to Guggenheim's *Discounted Cash Flow Analyses*, the Proxy (at

page 90) fails to disclose:  (i) certain of the inputs and assumptions underlying Barclays' calculation of the discount rate range of 8.0%-9.25%, including the beta and risk free rate; (ii) the basis for the terminal value perpetuity growth rates range of 1.75% to 2.25% Guggenheim used its analysis; and (iii) whether Guggenheim incorporated Kindred's NOLs into its analysis.

61.    The financial advisors also performed several additional "illustrative" analyses that were not considered part of their fairness opinions, but were included in the Proxy.  The Proxy's descriptions of many of these analyses fail to disclose material information.

62.    For example, with respect to Barclays' analyses, the Proxy fails to disclose, *inter alia*:  (i) for the *Illustrative Potential Separation Costs* analysis (Proxy at 80), Kindred's make-whole costs on its existing debt and the estimated fees and expenses related to issuing new debt financing; (ii) for the *Research Price Target Analysis* (Proxy at 80-81), the identity of the equity research firms Barclays selected for its analysis, the individual price targets published by such firms, and the mean and median price targets for the group of firms; (iii) for the *Illustrative Future Share Price Analysis* (Proxy at 81), Kindred's rent expense and the NOLs used in the analysis[1]; (iv) for the *Illustrative Discounted Cash Flow Sensitivity Analysis* (Proxy at 82), the inputs and assumptions underlying Barclays' calculation of the discount rate range and the basis for the terminal value perpetuity growth rates range; and (v) for the *Illustrative Future Share Price Sensitivity Analysis* (Proxy at 82), Kindred's rent expense and the NOLs used in the analysis.

63.    For example, with respect to Guggenheim's analyses, the Proxy fails to disclose,

---

[1] Through its *Illustrative Future Share Price Analysis*, Barclays calculated a range of implied present values at 8x EBITDAR of between $12.18 per share and $13.69 per share, which is well above the $9.00 Merger Consideration.  Proxy at 81.

*inter alia*:  (i) for the *Illustrative Discounted Cash Flow Analyses (Tax Bill Cases)* (Proxy at 93), the inputs and assumptions underlying Guggenheim's calculation of the discount rate range and the basis for the terminal value perpetuity growth rates range; and (ii) for the *Wall Street Equity Research Analyst Stock Price Targets* analysis (Proxy at 93), the identity of the Wall Street equity research analysts Guggenheim selected for its analysis, the individual price targets published by such analysts, and the mean and median price targets for the group of analysts.

64.     The non-disclosed information discussed in ¶¶ 58-63, above, would be material to Kindred shareholders in deciding how to vote their shares, as the real informative value of the financial advisor's work is not in its conclusion, but in the valuation analyses that buttresses that result.  When a financial advisor's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion, as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

***Material Omissions Concerning Potential Conflicts of Interest that May have Tainted the Merger Negotiation and Sales Process***

65.     The Proxy also fails to disclose material information regarding potential conflicts of interest that may have tainted Merger negotiation and sales process.

66.     The Proxy discusses the fact that because Defendant Mansukani served as a senior advisor to TPG, "senior management indicated that a process would be followed in order to appropriately address any conflict that might arise from such affiliation in the context of the Board's evaluation of a transaction involving TPG."  Proxy at 51.  However, the details of the "process" for addressing the conflict with Mansukani were never disclosed.  Nor was it ever disclosed whether this "process" was approved by the Board or its Transaction Committee (as that term is defined in the Proxy and used herein)[2] that was formed to provide oversight of and

---

[2] The members of the Transaction Committee were Defendants Yale, Diaz, Ackerman, and

advice to senior management with respect to Kindred's evaluation of potential strategic alternatives. Without knowing the details of the process or whether it was approved, it is impossible for Kindred shareholders to evaluate whether the conflicted Defendant Mansukani had any undue influence on the Merger negotiations to the possible detriment of shareholders.

67.     Moreover, although Defendant Mansukani was excluded from the process at some point and did not participate in the vote to approve the Merger Agreement with the Consortium, he *was* included in certain Board meetings *after* TPG made its interest in acquiring Kindred known to the Board (in April 2017). For example, the Proxy states that "[d]uring the August 2 Board meeting, Dr. Mansukani and the Board determined that, because [he] served as a Senior Advisor to TPG, he would thereafter recuse himself from Board deliberations regarding a potential transaction with the Consortium and would not receive any related materials distributed to the Board." Proxy at 56. This raises several important questions, including, *inter alia*: (i) at what point during the August 2, 2017 Board meeting was Mansukani excluded (this is especially important as a potential Merger with the Consortium and with other potential acquirors, and their recent acquisition proposals, were extensively discussed, as was the prospect of Kindred remaining as a standalone public company); (ii) why was Mansukani was not excluded from all future Board deliberations and from receiving Board materials much earlier in the Merger negotiation process when TPG initially became involved; and (iii) whether, prior to August 2, 2017, Mansukani was receiving all Board materials including those addressing a potential merger with TPG.

68.     Also according to the Proxy, on November 1, 2017, the Executive Compensation Committee of the Board met in person with representatives of senior management at a regularly

Goodman.  Proxy at 41.

scheduled meeting to discuss various "compensation issues that would arise in connection with the potential [merger] transaction" with the Consortium, including "the proposed terms of deal bonus and retention bonus pools to provide incentives for a successful completion of the transaction and integration planning."   Proxy at 59.   During the meeting, the Executive Compensation Committee "directed senior management to continue to engage with the Consortium regarding treatment of incentive compensation and other retention matters."   *Id*. What the Proxy does not disclose is that Defendant Mansukani was a member of the Executive Compensation Committee.[3]   It also fails to disclose the crucial detail of whether Mansukani attended this meeting, which would potentially have constituted a conflict of interest.[4]

69.     The Proxy states that, approximately two weeks before the final vote to approve the Merger Agreement, Defendant Breier was granted permission to engage in employment discussions with the Consortium.  Proxy at 64.  If the Merger is consummated, Defendant Breier will become the CEO of Kindred Healthcare and stands to receive approximately $20 million in Merger-related payments, including cash severance payments and equity awards.  Proxy at 97-103.  However, the Proxy does not disclose whether Defendant Breier was ever asked to recuse himself from the final vote, or whether it was even considered by the Board or Transaction Committee.

70.     The Proxy provides that, during the Merger negotiation and sales process, the

---

[3]   *See*  Kindred's April 4, 2017 Definitive Proxy Statement, at p. 9; *see also* http://investors.kindredhealthcare.com/corporate-governance/committee-composition   (last accessed Feb. 7, 2018).

[4]  The Proxy also states that the Executive Compensation Committee met telephonically with representatives of senior management to discuss estimated 280G calculations (having to do with "disqualified individuals" under Section 280G of the Internal Revenue Code of 1986) that had been provided to the Consortium.  Proxy at 61.  Again, there is no disclosure that Defendant Mansukani was on the Executive Compensation Committee, or whether he attended that meeting.

Company entered into numerous "standstill agreements" with potential acquisition partners, including the Consortium.  However, not all of the agreements were necessarily the same.  The Proxy explicitly states that for *some* of the standstill agreements, the acquirors were "permitted . . . to submit confidential proposals to the Board in the event that Kindred entered into a definitive agreement to consummate, or publicly announced its plans to enter into, a change of control or similar strategic transaction."  *See, e.g.*, Proxy at 44 (describing standstill agreement with Humana); 51 (describing standstill agreement with TPG).  For other standstill agreements, the Proxy did not contain this explicit statement, so it is unclear whether parties to these agreements were provided with the same right to submit confidential proposals following news of a definitive merger agreement (or whether was there a don't-ask-don't-waive ("DADW") provision[5] with respect to them).  *See, e.g.*, Proxy at 39 (describing standstill agreement with Financial Party A).  The disclosure of this information would be material to Kindred shareholders, as they need to be fully informed about whether their fiduciaries have put in place restrictive devices to foreclose a topping bid for the Company with respect to certain, non-favored, acquirors.

71.     The non-disclosed information discussed in ¶¶ 66-70, above, would be material to Kindred shareholders in deciding how to vote their shares, as shareholders need to understand the motivations and conflicts that could potentially influence or prevent fiduciaries from acting solely in their best interests and that of the Company.

---

[5] A DADW provision prohibits potential acquirors from even *asking* the target to waive the standstill prohibitions to allow them to submit topping bids.  Several courts have noted that DADW provisions violate a target board's duty to act reasonably, in an informed matter, and in furtherance of the goal of seeking the highest possible sales price, and therefore have ordered injunctive relief when a danger existed that such clauses prevented superior bids from arising.

72.    In sum, without the material disclosures discussed above, it is impossible for Kindred's shareholders to fully understand and interpret the financial analyses, including their impact on the fairness of the Merger Consideration, as well as to consider the impact of potential conflicts of interest that may have tainted the sales process, when determining whether to vote in favor of the Proposed Transaction.

## CLASS ACTION ALLEGATIONS

73.    Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of herself and the other public stockholders of Kindred as of February 5, 2018 or thereafter (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

74.    This action is properly maintainable as a class action for the following reasons:

a.    The Class is so numerous that joinder of all members is impracticable.  As of January 31, 2018, there were 91,413,775 shares of Kindred common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

b.    Questions of law and fact are common to the Class, including, among others: (i) whether Defendants have violated Sections 14(a) and 20(a) of the Exchange Act in connection with the Proposed Transaction; and (ii) whether Plaintiff and the Class would be irreparably harmed if the Proposed Transaction is consummated as currently contemplated and pursuant to the Proxy as currently composed.

c.    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

f.      Questions of law or fact common to class members predominate over any questions affecting only individual members and a class action is superior to other available methods for fairly and efficiently adjudicating this controversy;

g.      Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, preliminary and final injunctive relief on behalf of the Class as a whole is entirely appropriate.

**CAUSES OF ACTION**

**<u>COUNT I</u>**

**Claim for Violation of Section 14(a) of the Exchange Act
and Rule 14a-9 Promulgated Thereunder
(Against All Defendants)**

75.      Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

76.      Section 14(a)(1) of the Exchange Act makes it "unlawful for any person . . . to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

77.      Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange

23

Act, provides that solicitation communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9(a).

78.     Rule 14a-9 further provides that, "[t]he fact that a proxy statement, form of proxy or other soliciting material has been filed with or examined by the [Securities and Exchange] Commission shall not be deemed a finding by the Commission that such material is accurate or complete or not false or misleading, or that the Commission has passed upon the merits of or approved any statement contained therein or any matter to be acted upon by security holders.  No representation contrary to the foregoing shall be made."  17 C.F.R. § 240.14a-9(b).

79.     As discussed herein, the Proxy misrepresented and/or omitted material facts concerning, *inter alia*: the financial analyses performed by Kindred's financial advisors in support of their so-called "fairness opinions" that approved the Merger Consideration, including the projections that the financial advisors relied upon in performing their financial analyses; and potential conflicts of interest that may have tainted the Merger negotiation and sales process.

80.     Defendants prepared, reviewed, filed and disseminated the false and misleading Proxy to Kindred shareholders.  In doing so, Defendants knew or recklessly disregarded that the Proxy failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

81.     The omissions and incomplete and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote

  
their shares.  In addition, a reasonable investor would view such information as altering the "total mix" of information made available to shareholders.

82.     By virtue of their positions within the Company and/or roles in the process and in the preparation of the Proxy, Defendants were undoubtedly aware of this information and had previously reviewed it, including participating in the Merger negotiation and sales process and reviewing the financial advisors' complete financial analyses purportedly summarized in the Proxy.

83.     The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Merger.

84.     Kindred is deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

85.     Defendants knew that Plaintiff and the other members of the Class would rely upon the Proxy in determining whether to vote in favor of the Merger.

86.     As a direct and proximate result of Defendants' unlawful course of conduct in violation of Section 14(a) of the Exchange Act and Rule 14d-9, absent injunctive relief from the Court, Plaintiff and the other members of the Class will suffer irreparable injury by being denied the opportunity to make an informed decision as to whether to vote in favor of the Merger.

87.     Plaintiff and the Class have no adequate remedy at law.

## COUNT II

### Claim for Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

88.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

89.     The Individual Defendants acted as controlling persons of Kindred within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Kindred, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

90.     Each of the Individual Defendants were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

91.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.   The Proxy contains the unanimous recommendation of each of the Individual Defendants (other than Mansukani) to approve the Proposed Transaction.  They were thus directly connected with and involved in the making of the Proxy.

92.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the Exchange Act and Rule 14d-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons and the acts described herein, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

93.     As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

94.     Plaintiff and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.     Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

C.     Directing the Individual Defendants to disseminate a Proxy that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.     In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

E.     Directing Defendants to account to Plaintiff and the Class for their damages sustained because of the wrongs complained of herein;

F.     Awarding Plaintiff and the Class the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

G.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED:  February 12, 2018.

*/s/Kenneth A. Bohnert*
Kenneth A. Bohnert
Edward Busch
Scott Johnson
**CONLIFFE, SANDMAN & SULLIVAN**
2000 Waterfront Plaza
325 West Main Street, Suite 2000
Louisville, KY 40202
Tel: (502) 587-7711
Fax: (502) 587-7756
Email: kbohnert@cssattorneys.com
       ebusch@cssattorneys.com
       sjohnson@cssattorneys.com

*Counsel for Plaintiff*

**OF COUNSEL:**

Carl L. Stine
Robert S. Plosky
**WOLF POPPER LLP**
845 Third Avenue
New York, New York 10022
Tel: (212) 759-4600
Fax: (212) 486-2093
Email: cstine@wolfpopper.com
       rplosky@wolfpopper.com